# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Shakopee Chevrolet Inc., | Court File No. _____ |
| Plaintiff, | |
| v. | |
| General Motors LLC, | **COMPLAINT** |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff Shakopee Chevrolet Inc. ("Shakopee Chevrolet"), for its Complaint against Defendant General Motors LLC ("GM"), states and alleges as follows:

## PARTIES

1.    Shakopee Chevrolet is a corporation organized and existing under the laws of Minnesota, with a principal place of business in Shakopee, Minnesota.

2.    Shakopee Chevrolet is a new motor vehicle dealer as defined by MINN. STAT. § 80E.03(3), and it operates a Chevrolet franchised motor vehicle dealership, where it sells and services GM products pursuant to a franchise, as defined by MINN. STAT. § 80E.03, subd. 8.

3.    GM is a limited liability company organized and existing under the laws of Delaware, with a principal place of business in Detroit, Michigan.

4.      GM is a manufacturer and distributor, as defined by MINN. STAT. § 80E.03, subds. 4 and 5, as it manufactures, *inter alia*, Chevrolet vehicles, and it offers to sell and sells those vehicles to new motor vehicle dealers in Minnesota.

5.      A true and correct copy of the dealer sales and service agreement currently in effect between Shakopee Chevrolet and GM (except that the Notice of Area of Primary Responsibility accompanying this agreement is disputed by Shakopee Chevrolet), and which expires by its terms on October 31, 2025, unless it is renewed ("Dealer Agreement") is attached hereto as ***Exhibit A***.

6.      The Dealer Agreement, as limited and governed by MINN. STAT. CH. 80E, establishes the contractual relationship between GM and Shakopee Chevrolet, pursuant to which Shakopee Chevrolet is authorized to transact business pertaining to new Chevrolet vehicles.

7.      As a part of its Dealer Agreement with GM, Shakopee Chevrolet is authorized to sell and service Chevrolet vehicles.

## JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. § 1332(a), federal diversity jurisdiction exists based upon the following facts: (1) Shakopee is a citizen of Minnesota, while GM is a citizen of Delaware and Michigan; and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Venue is proper in the Federal District Court for the District of Minnesota pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this Complaint occurred in Shakopee, Minnesota.

# FACTS

**A.      In or about October 2010: Shakopee Chevrolet becomes a GM dealer and is assigned an Area of Primary Responsibility.**

10.      General Motors Corporation, the predecessor of GM, terminated Shakopee Chevrolet's franchise in conjunction with the bankruptcy proceeding that General Motors Corporation commenced on or about June 1, 2009.

11.      When GM commenced operations after the bankruptcy, GM instituted the practice of entering into contracts with dealers that extended for only 5 years and then had to be renewed.

12.      In or about July 2010, Shakopee Chevrolet demanded arbitration with GM to seek reinstatement of its GM franchise, and Shakopee Chevrolet succeeded in obtaining reinstatement.

13.      In or about October 2010, Shakopee Chevrolet and GM entered into a dealer sales and service agreement.

14.      At the same time, or shortly thereafter, GM, with Shakopee Chevrolet's consent, assigned Shakopee Chevrolet an Area of Primary Responsibility ("APR")[1] as follows:

---

[1]      In the case of certain dealers, rather than an APR, GM assigns an "Area of Geographic Sales and Service Advantage" or "AGSSA" as the area of sales effectiveness, as that term is defined by MINN. STAT. § 80E.03, subd. 10b. The term "APR," as used throughout this Complaint, also includes and incorporates by reference the other area of sales effectiveness, AGSSA, used by GM.

The following U.S. Census Tract(s) contained in CARVER county, MINNESOTA: 907.02

And the following U.S. Census Tract(s) contained in SCOTT county, MINNESOTA: 803.01 803.02 804.00 805.00 806.00 809.03

("Existing APR"). ***Exhibit B.***

15.     Upon reinstatement of Shakopee Chevrolet's franchise and execution of a dealer sales and service agreement, as Shakopee Chevrolet resumed operating as a GM dealer, GM allocated Shakopee Chevrolet a mere 11 new vehicle units to sell to consumers in Shakopee Chevrolet's APR, which included thousands of new vehicle registrations.

16.     GM's application to Shakopee Chevrolet of GM's system for allocating new vehicles among dealers has prevented Shakopee Chevrolet from maintaining necessary inventories of new GM vehicles, particularly with respect to key vehicle segments and vehicles equipped with the most popular options.

17.     GM renewed Shakopee Chevrolet's dealer sales and service agreement in or about October 2015. In conjunction with this dealer sales and service agreement, GM assigned to Shakopee Chevrolet the same census tracts that compose the Existing APR.

18.     In or about January 2016, however, shortly after GM closed an open point in Burnsville, Minnesota, GM sought to increase Shakopee Chevrolet's APR, but Shakopee Chevrolet objected to this change.

19.     Shakopee Chevrolet explained to GM that the proposed unilateral APR change was null and void as it violated MINN. STAT. CH. 80E.

20.     Shakopee Chevrolet also sought to protest the proposed APR change by following the dispute-resolution mechanism that GM provided in the dealer sales and service agreement.

21.     GM, however, refused to participate in the contractual dispute-resolution process contained in the dealer sales and service agreement to address Shakopee Chevrolet's objections and challenge to the proposed APR change.

**B.     September 1, 2020: GM provides Shakopee Chevrolet notice of GM's intent to substantially increase Shakopee Chevrolet's APR.**

22.     On or about September 1, 2020, GM generated and made accessible to Shakopee Chevrolet, via an internet link, documents that GM required Shakopee Chevrolet to execute as a condition to renewal of the dealer sales and service agreement then in effect, which was set to expire by its terms on October 31, 2020.

23.     The documents that GM generated and made accessible to Shakopee Chevrolet on or about September 1, 2020 included: a proposed Dealer Sales and Service Agreement (which required the signature of Shakopee Chevrolet's Dealer Operator), Dealer Sales and Service Agreement 2020 Standard Provisions, a Manufacturer's Certification of Dealer, a Capital Standard Addendum, a Location and Premises Addendum (which required the signature of Shakopee Chevrolet's Dealer Operator), a Notice of Area of Primary Responsibility ("2020 APR Notice"), a Dealer Operator Addendum (which required the signature of Shakopee Chevrolet's Dealer Operator), a Statement of Ownership (which required the signature of Shakopee Chevrolet's Dealer Operator), a Trade Name Addendum (which required the signature of Shakopee

Chevrolet's Dealer Operator), and a Motor Vehicle Addendum (collectively, "Dealer Agreement").

24.     The 2020 APR Notice provided that it is "effective <u>November 1, 2020</u>, and is executed pursuant to Article 4.2 of the current Dealer Agreement in effect between Dealer and General Motors LLC." A true and correct copy of the 2020 APR Notice is attached hereto as ***Exhibit A at Notice of Area of Primary Responsibility***.

25.     Article 4.2 of the Dealer Agreement Standard Provisions states:

Dealer is responsible for effectively selling, servicing and otherwise representing General Motors Products in the area designated in a Notice of Area of Primary Responsibility. The Area of Primary Responsibility is used by General Motors in assessing performance of dealers and the dealer network. General Motors retains the right to revise Dealer's Area of Primary Responsibility at General Motors sole discretion consistent with dealer network planning objectives. If General Motors determines that marketing conditions warrant a change in Dealer's Area of Primary Responsibility, it will advise Dealer in writing of the proposed change, the reasons for it, and will consider any information the Dealer submits. Dealer must submit such information in writing within 30 days of receipt of notice of the proposed change. If requested by Dealer within the thirty days, General Motors will extend the time for an additional 30 days for Dealer to obtain and submit relevant information. If General Motors thereafter decides the change is warranted, it will issue a revised Notice of Area of Primary Responsibility.

***Id. at Standard Provisions § 4.2***.

26.     The 2020 APR Notice further provides:

The area more specifically described below and known as SHAKOPEE, MINNESOTA is the Dealer's Area of Primary Responsibility for Chevrolet Motor Vehicles. The Area of Primary Responsibility is described by the specific census tracts listed below. The attached map is for reference purposes only.

The following U.S. Census Tract(s) contained in CARVER County, MINNESOTA:  907.02

And all of SCOTT County, MINNESOTA except the following U.S. Census Tract(s): 801.00 807.00 808.00 809.04 809.06 810.00 811.00 812.00 813.00

***Id. at Notice of Area of Primary Responsibility.***

27.    Shakopee Chevrolet again objected to this attempted change of its Existing

APR.

28.    Shakopee Chevrolet explained to GM that the proposed unilateral APR

change was null and void as it violated MINN. STAT. CH. 80E.

29.    GM did not allow Shakopee Chevrolet 90 days to protest this APR

assignment, pursuant to MINN. STAT. § 80E.13(p).

**C.    October 16, 2020: GM threatens to decline to renew Shakopee Chevrolet's franchise unless Shakopee Chevrolet executes the Dealer Agreement, which includes the 2020 APR Notice.**

30.    In a letter dated October 16, 2020, GM wrote to Shakopee Chevrolet's

Dealer Operator:

As you know, the 2015 Dealer Sales and Service Agreement for Chevrolet between Shakopee Chevrolet, Inc. and General Motors LLC expires by its terms on October 31, 2020. General Motors has offered to renew its franchise relationship with Shakopee Chevrolet by offering a new Dealer Sales and Service Agreement (the "New Dealer Agreement"), which, if signed, would become effective on November 1, 2020.

However, I understand that you have decided not to execute the New Dealer Agreement. Should you fail to timely execute the New Dealer Agreement, the franchise relationship for Chevrolet between General Motors and Shakopee Chevrolet will end October 31, 2020.

31.    On October 22, 2020, Shakopee Chevrolet responded by restating its

objection to the proposed change to Shakopee Chevrolet's Existing APR, and Shakopee

Chevrolet notified GM that it had a right under MINN. STAT. § 80E.13(p) to protest the

proposed change.

32.     Shakopee Chevrolet further explained:

[I]nsofar as your letter directed to Shakopee Chevrolet dated October 16,
2020 represents a threat to not renew Shakopee Chevrolet's franchise
agreement, it is invalid as it fails to comport with the requirements of Minn.
Stat. § 80E.06, subd. 1. In addition to failing to satisfy the notice requirement
of Minn. Stat. § 80E.08, any attempt by GM to decline to renew Shakopee
Chevrolet's franchise agreement would not be made in good faith, as defined
by Minn. Stat. § 80E.03, subd. 9, nor does good cause exist under Minn. Stat.
§ 80E.06, subd. 2 for nonrenewal.

33.     At the conclusion of its letter to GM, Shakopee Chevrolet stated that it "is

prepared to sign a franchise agreement that contains the currently existing APR, along

with any additional territory mutually agreed upon by GM and Shakopee Chevrolet. To

that end, Shakopee Chevrolet invites a meeting between GM's representatives and

Shakopee Chevrolet's representatives to discuss how the parties may best work together

to accomplish their mutual objectives."

34.     GM, however, declined to participate in such a meeting with Shakopee

Chevrolet.

35.     Instead, GM responded to Shakopee Chevrolet's October 22, 2020 letter by

contending, in a letter dated October 28, 2020:

The APR under the Proposed 2020 Dealer Agreement (the "Subject APR")
has been in place for nearly five years. By letter dated December 1, 2015,
GM notified Shakopee Chevrolet that GM was tentatively planning to change
the initial APR under the Current 2015 Dealer Agreement to the
configuration of the Subject APR. By letter dated January 25, 2016, GM
notified [Shakopee Chevrolet] that the tentative APR changes would become
final and provided [Shakopee Chevrolet] with a Notice of Area of Primary
Responsibility, effective January 27, 2016, establishing the Subject APR as

8

the APR under the Current 2015 Dealer Agreement. . . . [T]he governing APR under the Current 2015 Dealer Agreement is the same as the APR under the Proposed 2020 Dealer Agreement. GM is not proposing or attempting to implement any change in Shakopee Chevrolet's APR by the Proposed 2020 Dealer Agreement.

36.     Shakopee Chevrolet commenced an action challenging the 2020 APR Notice on October 30, 2020, Court File No. 20-cv-2366 (JRT/JFD), and this action remains pending.

37.     On the same date, October 30, 2020, in response to correspondence from Shakopee Chevrolet, GM wrote to Shakopee Chevrolet: "While GM rejects any proposal to modify the APR described by the 2020 Dealer Sales and Service Agreement, GM agrees that execution of the agreement by Shakopee Chevrolet will not constitute waiver of any rights the dealership may have to challenge the configuration of the APR."

38.     With this understanding in place, Shakopee Chevrolet executed the Dealer Agreement.

**D.     June 28, 2022: GM provides Shakopee Chevrolet a new notice of GM's intent to further substantially increase Shakopee Chevrolet's APR.**

39.     On or about June 28, 2022, GM sent Shakopee Chevrolet another APR notice ("2022 APR Notice") indicating that GM intended to increase Shakopee's APR substantially more than it had attempted to do via the 2020 APR Notice.

40.     The 2022 APR Notice, though it is not executed and purports to only propose a change to Shakopee Chevrolet's APR, provides that it "is executed pursuant to Article 4.2 of the current Dealer Agreement in effect between Dealer and General Motors." A true and correct copy of the 2022 APR Notice is attached hereto as ***Exhibit C***.

9

41.     The 2022 APR Notice provides:

The area more specifically described below and known as SHAKOPEE, MINNESOTA is the Dealer's Area of Primary Responsibility for Chevrolet Motor Vehicles. The Area of Primary Responsibility is described by the specific census tracts listed below. The attached map is for reference purposes only.

All of SCOTT County, MINNESOTA except the following U.S. Census Tract(s): 801.00  802.08  808.01  808.02  810.01  810.02  811.01  811.02  811.03  812.00 813.01  813.02

*Exhibit C*.

42.     GM did not provide any reasons for the proposed change to Shakopee Chevrolet's APR.

43.     GM claimed, in a June 28, 2022 letter, that GM had conducted a "review" of Shakopee Chevrolet's APR, stating that "[t]he review includes many factors including, but not limited to, the proximity of census tracts to the nearest Chevrolet dealerships, road networks and any natural barriers, and buyer behavior information."

44.     Tellingly, in proposing to change Shakopee Chevrolet's APR with the 2022 APR Notice, GM did not claim to have taken into consideration, at all, the present pattern of motor vehicle sales and registrations within Shakopee Chevrolet's market.

45.     Shakopee Chevrolet's Existing APR is made up of 7 census tracts.

*Exhibit B*.

46.     The population of Shakopee Chevrolet's Existing APR is approximately 45,388.

47.     The area described by the 2020 APR Notice consists of 13 census tracts. ***Exhibit A at Notice of Area of Primary Responsibility.***

48.     The population of the area described by the 2020 APR Notice is approximately 75,434.

49.     The area described by the 2022 APR Notice consists of 21 census tracts. ***Exhibit C***.

50.     The population of the area described by the 2022 APR Notice is approximately 102,619.

**E.     GM's sales performance requirement, as applied to Shakopee Chevrolet, would change drastically if the 2022 proposed APR were to become effective.**

51.     Each GM dealer is required to materially satisfy obligations set forth in its respective dealer sales and service agreement to avoid being subjected to termination.

52.     Among the obligations contained in each GM dealer's dealer sales and service agreement is a requirement that the "Dealer agrees to effectively, ethically and lawfully sell and promote the purchase, lease and use of Products by consumers located in its Area of Primary Responsibility." ***Exhibit A at Standard Provisions § 5.1.1***.

53.     GM measures its dealers' sales effectiveness based on a calculation of a dealer's Retail Sales Index ("RSI"). Under GM's RSI formula, a dealer's overall retail new vehicle sales (wherever made) are compared against the total registrations (sales by any dealer) of same-segment vehicles within the dealer's APR (regardless of what dealer, of whatever line-make, makes these sales).

54.     GM then divides this ratio of overall retail new vehicle sales to total same-segment retail new vehicle registrations within the dealer's APR by a number that is supposed to represent GM's market share for the State of Minnesota, and then it multiplies this number by 100 to generate the dealer's RSI.

55.     Under the Dealer Agreement, "[t]o achieve a 'Satisfactory' performance rating, dealer must have an RSI of at least 100. *Id. § 9*.

56.     If GM determines that a GM dealer "has failed to adequately perform its sales or service responsibilities," then "General Motors will notify Dealer in writing of the nature of Dealer's failure and of the period of time (which shall not be less than six months) during which Dealer will have the opportunity to correct the failure. . . . If . . . Dealer remains in material breach of its obligations at the expiration of the period, General Motors may terminate this Agreement by giving Dealer 90 days advance written notice." *Id. § 13.2*.

57.     The number of new motor vehicle sales each GM dealer must make to reach an RSI of 100 is unique in the case of each dealer, as it is determined by comparing a "Dealer's retail sales to retail sales opportunities by segment in Dealer's Area of Primary Responsibility or Area of Geographical Sales and Service Advantage, whichever is applicable." *Id. § 9*.

58.     The APR assigned by GM to Shakopee Chevrolet is an area of sales effectiveness, as that term is defined by MINN. STAT. § 80E.03, subd. 10b, as it is "a geographic area designated in a franchise agreement or related document where a new

motor vehicle dealer is responsible for effectively selling, servicing, and otherwise representing the products of the manufacturer, distributor, or factory branch."

59.     When properly drawn, an area of sales effectiveness is the geographical area in which a dealer enjoys a competitive advantage over all other dealers of the same line-make when all pertinent factors are considered.

60.     A dealer's competitive advantage diminishes as customers' geographic distance from the dealership increases, and also diminishes when natural obstacles (such as rivers), traffic patterns, or other factors tend to make shopping for, or servicing of, a motor vehicle less convenient at a particular dealership location relative to a competing dealership location, even if the consumer is physically closer to the first dealership.

61.     The APR that GM assigns to a dealer is fair, reasonable, and based on accurate information only if the APR, at a minimum, complies with MINN. STAT. § 80E.13(p) and does not cause the dealer's contractual performance obligations to be unreasonable, unfair, or not uniformly applied in violation of MINN. STAT. § 80E.13(o).

62.     Shakopee Chevrolet does not enjoy a competitive advantage with respect to at least 14 of the 21 census tracts listed in the 2022 APR Notice.

63.     Assignment of at least 14 of the 21 census tracts listed in the 2022 APR Notice, moreover, is inconsistent with any fair, equitable, and consistent methodology on the part of GM in assigning APRs to GM dealers.

64.     GM's proposed 2022 APR assignment for Shakopee Chevrolet is not based on any change to the market in which Shakopee Chevrolet operates, nor is it based on any change to the new vehicle sales or registrations within this market.

65.    Rather, GM's proposed APR assignments for Shakopee Chevrolet result from GM closing what had been an open point in Burnsville, Minnesota.

66.    GM's inclusion of these census tracts, in which Shakopee Chevrolet enjoys no competitive advantage, in Shakopee Chevrolet's APR would unfairly and unreasonably depress the RSI calculation applied to Shakopee Chevrolet.

67.    Additionally, at no point in time has GM ever allocated to Shakopee Chevrolet new vehicles sufficient to permit Shakopee Chevrolet to meet GM's sales performance requirements, as GM has changed these requirements over time, if Shakopee Chevrolet's APR were to be as set forth in the 2022 APR Notice.

68.    If the area described by the 2022 APR Notice were to become Shakopee Chevrolet's APR, on information and belief, Shakopee Chevrolet's RSI obligation would be increased by 115% – 140%.

69.    Moreover, GM has a documented history of failing to allocate to Shakopee Chevrolet, in the same manner and at the same level that it provides to other GM dealers in the Twin Cities area, new GM vehicles that: (1) Shakopee Chevrolet requests; and (2) are necessary for Shakopee Chevrolet to receive if GM's RSI requirement, as GM applies its RSI requirement to Shakopee Chevrolet under the Dealer Agreement, is to be attainable.

70.    At the same time, by making discretionary allocations of new GM vehicles to competing GM dealers, GM has increased the registrations in Shakopee Chevrolet's Existing APR against which Shakopee Chevrolet's RSI is measured.

71.     GM's history of shorting Shakopee Chevrolet vehicles has prevented Shakopee Chevrolet from fully serving demand even in various sectors of the Existing APR—and would cause Shakopee Chevrolet to fall woefully short of meeting demand within the increased area described by the 2022 APR Notice.

72.     As a result of GM's uneven allocation of new GM vehicles, and its refusal to allocate to Shakopee Chevrolet vehicles necessary to permit Shakopee Chevrolet to penetrate its Existing APR, much less the area described in the 2022 APR Notice, GM's threat to assign to Shakopee Chevrolet as its area of sales effectiveness the territory described in the 2022 APR Notice would be particularly injurious to Shakopee Chevrolet—and would substantially and adversely skew Shakopee Chevrolet's RSI.

## COUNT I
## VIOLATION OF MINN. STAT. § 80E.13(p)

73.     Shakopee Chevrolet incorporates and realleges the foregoing paragraphs as though set forth fully herein.

74.     MINN. STAT. § 80E.13(p) makes it unlawful and an unfair practice for a manufacturer to do the following:

> [A]ssign or change a dealer's area of sales effectiveness arbitrarily or without due regard to the present pattern of motor vehicle sales and registrations within the dealer's market. The manufacturer, distributor, or factory branch must provide at least 90 days' notice of the proposed change. The change may not take effect if the dealer commences a civil action within the 90 days' notice period to determine whether the manufacturer, distributor, or factory branch met its obligations under this section. The burden of proof in such an action shall be on the manufacturer or distributor. In determining at the evidentiary hearing whether a manufacturer, distributor, or factory branch has assigned or changed a dealer's area of sales effectiveness arbitrarily or without due regard to the present pattern of motor vehicle sales and

15

registrations within the dealer's market, the court may take into consideration the relevant circumstances, including, but not limited to:

(1)     the traffic patterns between consumers and the same line-make franchised dealers of the affected manufacturer, distributor, or factory branch who are located within the market;

(2)     the pattern of new vehicle sales and registrations of the affected manufacturer, distributor, or factory branch within various portions of the area of sales effectiveness and within the market as a whole;

(3)     the growth or decline in population, density of population, and new car registrations in the market;

(4)     the presence or absence of natural geographical obstacles or boundaries, such as rivers;

(5)     the proximity of census tracts or other geographic units used by the affected manufacturer, factory branch, distributor, or distributor branch in determining the same line-make dealers' respective areas of sales effectiveness; and

(6)     the reasonableness of the change or proposed change to the dealer's area of sales effectiveness, considering the benefits and harm to the petitioning dealer, other same line-make dealers, and the manufacturer, distributor, or factory branch.

75.     Independent of the language of MINN. STAT. § 80E.13(p), which expressly allows for a civil action, MINN. STAT. § 80E.17 provides a right of action for any dealer that is harmed by a refusal to accede to a proposal which, if consummated, would violate MINN. STAT. CH. 80E.

76.     MINN. STAT. § 80E.17 provides:

Notwithstanding the terms of any franchise agreement or waiver to the contrary, any person whose business or property is injured by a violation of sections 80E.01 to 80E.17, or any person injured because of the refusal to accede to a proposal for an arrangement which, if consummated, would be in violation of sections 80E.01 to 80E.17, may bring a civil action to enjoin

16

further violations and to recover the actual damages sustained, together with costs and disbursements, including reasonable attorneys' fees.

77.     GM's decision to propose to assign to Shakopee Chevrolet, as its APR, the territory described in the 2022 APR Notice arbitrarily and without due regard to the present pattern of motor vehicle sales and registrations within Shakopee Chevrolet's market violates MINN. STAT. § 80E.13(p).

78.     At least 14 of the proposed 21 census tracts that GM seeks to include in Shakopee Chevrolet's area of sales effectiveness would not be included if GM complied with the statute.

79.     GM's refusal to fairly and accurately assign Shakopee Chevrolet's area of sales effectiveness has already injured and, if consummated, would further injure Shakopee Chevrolet.

80.     Among other harms, Shakopee Chevrolet's RSI would be unfairly and arbitrarily depressed, overnight, due to GM's inclusion within Shakopee Chevrolet's area of sales effectiveness territory with respect to which Shakopee Chevrolet has no competitive advantage and which would not be assigned to Shakopee Chevrolet if GM employed a fair, equitable, and consistent methodology in assigning areas of sales effectiveness.

81.     The harmful impact of GM's refusal to allocate vehicles to Shakopee Chevrolet on a reasonable, fair, and equitable basis, moreover, and the diminution in Shakopee Chevrolet's RSI as a result of this practice, would be exacerbated if GM's proposed area of sales effectiveness assignment took effect.

82.     Pursuant to MINN. STAT. § 555.01, *et seq.*, Shakopee Chevrolet seeks a declaratory judgment that GM, by the 2022 APR Notice, is attempting to assign or change Shakopee Chevrolet's area of sales effectiveness arbitrarily or without due regard to the present pattern of motor vehicle sales and registrations within Shakopee Chevrolet's market.

## COUNT II
## VIOLATION OF MINN. STAT. §§ 80E.13(k), 80E.135, SUBD. 1, AND 80E.12(j)

83.     Shakopee Chevrolet incorporates and realleges the foregoing paragraphs as though set forth fully herein.

84.     MINN. STAT. § 80E.13(k) makes it unlawful and an unfair practice for a manufacturer to "threaten to modify or replace or modify or replace a franchise with a succeeding franchise that would adversely alter the rights or obligations of a new motor vehicle dealer under an existing franchise or that substantially impairs the sales or service obligations or investments of the motor vehicle dealer."

85.     MINN. STAT. § 80E.135, subd. 1 provides:

No manufacturer, distributor, or factory branch shall, before entering into a franchise with a new motor vehicle dealer or during the franchise term, use any written instrument, agreement, or waiver, to attempt to nullify or modify any provision of this chapter or prevent a new motor vehicle dealer from bringing an action in a particular forum otherwise available under law. These instruments, agreements, and waivers are null and void.

86.     MINN. STAT. § 80E.12(j) makes it unlawful for a manufacturer to require a dealer to do the following:

[P]rospectively assent to a release, assignment, novation, waiver, or estoppel whereby a dealer relinquishes any rights under sections 80E.01 to 80E.17, or which would relieve any person from liability imposed by sections 80E.01

18

to 80E.17 or to require any controversy between a new motor vehicle dealer and a manufacturer, distributor, or factory branch to be referred to any person or tribunal other than the duly constituted courts of this state or the United States, if the referral would be binding upon the new motor vehicle dealer.

87.    GM's attempt by or in accordance with the 2022 APR Notice to unilaterally increase Shakopee Chevrolet's area of sales effectiveness, an attempt to which Shakopee Chevrolet objects and protests by this action, is a violation of MINN. STAT. § 80E.13(k) and, accordingly, did not and cannot effect a change in Shakopee Chevrolet's area of sales effectiveness.

88.    Moreover, GM's attempt to deny or require Shakopee Chevrolet to relinquish its rights under MINN. STAT. § 80E.13(k) through unilateral alteration of Shakopee Chevrolet's APR is null and void under MINN. STAT. § 80E.135, subd. 1 and MINN. STAT. § 80E.12(j) as well as MINN. STAT. § 80E.13(k).

89.    Pursuant to MINN. STAT. § 555.01, *et seq.*, Shakopee Chevrolet seeks a declaratory judgment that any attempt by GM to increase Shakopee Chevrolet's area of sales effectiveness by or in accordance with the 2022 APR Notice did not and cannot effect any change in Shakopee Chevrolet's area of sales effectiveness as any such attempt would violate MINN. STAT. § 80E.13(k) and is null and void under MINN. STAT. § 80E.135, subd. 1 and MINN. STAT. § 80E.12(j) as well as MINN. STAT. § 80E.13(k).

## **PRAYER FOR RELIEF**

WHEREFORE, Shakopee Chevrolet prays for the following relief:

1.    Pursuant to MINN. STAT. § 555.01, *et seq.*:

   a.    a declaratory judgment that any attempt by GM to increase

Shakopee Chevrolet's area of sales effectiveness by or in accordance with the 2022 APR Notice did not and cannot effect any change in Shakopee Chevrolet's area of sales effectiveness as any such attempt would violate MINN. STAT. § 80E.13(k) and is null and void under MINN. STAT. § 80E.135, subd. 1 and MINN. STAT. § 80E.12(j) as well as MINN. STAT. § 80E.13(k);

      b.      a declaratory judgment that GM, by the 2022 APR Notice, is attempting to assign or change Shakopee Chevrolet's area of sales effectiveness arbitrarily or without due regard to the present pattern of motor vehicle sales and registrations within Shakopee Chevrolet's market;

2.      Pursuant to MINN. STAT. § 80E.17:

      a.      an injunction enjoining GM from continuing to violate MINN. STAT. §§ 80E.135, subd. 1, 80E.12(j), and 80E.13(p) by its issuance and requiring of accession to the 2022 APR Notice;

      b.      compensatory damages in an amount exceeding $50,000, the exact amount to be proven at trial;

      c.      costs and disbursements, including reasonable attorney's fees.

SHAKOPEE CHEVROLET DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.

**THOM ELLINGSON, PLLP**

Dated: <u>September 16, 2022</u>

*/s/ Aaron R. Thom*
Aaron R. Thom (#0392646)
Samantha J. Ellingson (#0397448)
athom@thomellingson.com
sellingson@thomellingson.com
825 Nicollet Mall, Suite 950
Minneapolis, MN 55402
Phone: (612) 286-0505
Fax: (612) 601-8955

***Attorneys for Plaintiff***